UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EBIX.COM, INC.,

    Plaintiff,

v.

FRANK H. McCRACKEN, JR., NICK
DIMARCO, PAULA DUNMIRE,
JOANNE STANTON, GAYLE
GRIFFITH, McCRACKEN INSURANCE
SOLUTIONS, LLC & McCRACKEN
FINANCIAL SOFTWARE, INC. f/k/a
GMAC COMMERCIAL SOFTWARE,
INC.

    Defendants.

Civil Action
No. CA02-10033-MLW



## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff, EBIX.COM, INC., a Delaware Corporation ("ebix" or the "Plaintiff"), hereby

files this Second Amended Complaint against Defendants FRANK H. McCRACKEN, JR.,

DOMINICK DIMARCO, PAULA DUNMIRE, JOANNE STANTON, GAYLE GRIFFITH,

McCRACKEN INSURANCE SOLUTIONS, LLC and McCRACKEN FINANCIAL

SOFTWARE, INC. f/k/a GMAC COMMERCIAL SOFTWARE, INC. (hereinafter collectively

referred to as "Defendants"), for injunctive relief and for damages arising from their: (1) Breach

of Confidentiality and other Employment Agreements; (2) Breach of the Illinois Trade Secrets

Act; (3) tortious interference with Plaintiff's advantageous contractual relations; (4) Breach of

the Massachusetts Trade Secrets Act; (5) Breach of M.G.L.c. 93A; and (6) Breach of the Federal

Copyright Act. These claims are based on Defendants' misappropriation of ebix's customer

lists, software, trade secrets and other business intangibles and the formation of new corporations that compete directly with the pre-existing business of ebix.

## JURISDICTION AND VENUE

Jurisdiction in this Court is appropriate pursuant to 17 U.S.C. §§ 504-510 and 28 U.S.C. §§ 1332, 1338(a).  Venue in this District is proper pursuant to 28 U.S.C. §§ 1391, 1400(a) and by order of the United States District Court for the Northern District of Illinois, Eastern Division (Pallmeyer, J.).

## THE PARTIES

1.      ebix is and at all relevant times was a Delaware corporation with a principal place of business in Schaumburg, Illinois.  ebix was formed in 1976 as Delphi Information Systems, Inc. ("Delphi"), which  changed its name to ebix in October of 1999.

2.      Defendant Frank H. McCracken, Jr. ("McCracken") is an individual who at all relevant times was a resident of the state of Massachusetts.

3.      Defendant Dominick DiMarco ("DiMarco") is an individual who at all relevant times was a resident of the state of Massachusetts.

4.      Defendant Paula Dunmire ("Dunmire") is an individual who at all relevant times was a resident of the state of Massachusetts.

5.      Defendant Joanne Stanton ("Stanton") is an individual who at all relevant times was a resident of the state of Massachusetts.

6.      Defendant Gayle Griffith ("Griffith") is an individual who currently resides in the state of Georgia.

7.      Defendant McCracken Insurance Solutions, LLC ("MIS") is a Delaware corporation with, upon information and belief, a principal place of business at 8 Suburban Park Drive, Billerica, Massachusetts 01821.  MIS was incorporated on or about February 20, 2001.

2

8.     Defendant McCracken Financial Solutions, Inc. ("MFS") is a Delaware with, upon information and belief, a principal place of business at 8 Suburban Park Drive, Billerica, Massachusetts 01821.  MFS was incorporated on or about February 26, 1998 as GMAC Commercial Software, Inc. ("GMAC").  On or about April 13, 1998, GMAC changed its name to McCracken Financial Software, Inc.  (Hereinafter, MIS and MFS will be referred to collectively as the "McCracken Entities").  Upon information and belief, MFS is and at all relevant times was a division of GMAC Commercial Holdings Corp., a corporation organized under the law of California.

9.     The McCracken Entities collectively conduct business in the United States under the above assumed business names.  Upon information and belief, the McCracken entities were formed for the specific purpose of competing directly with ebix, in violation of contractual obligations expressly prohibiting the same.

10.     The McCracken Entities improperly compete with Plaintiff by (i) soliciting Plaintiff's customers and (ii) performing computer software upgrade and support services on computer software owned and copyrighted by Plaintiff and licensed exclusively to its customers.

## ALLEGATIONS COMMON TO ALL COUNTS AND INCORPORATED BY REFERENCE

### Delphi's Purchase of McCracken Computer and McCracken's Non-Competition Agreement

11.     On or about January 2, 1991, Delphi purchased all of the issued and outstanding stock of McCracken's wholly owned company, McCracken Computer, Inc. ("MCI"), which was immediately merged into Delphi.  As a result, Delphi acquired all right, title and interest to (among other things) the MCI software system known as Insight, a computer software system designed for and marketed to the insurance industry ("Insight System").

3

with the Plaintiff; (ii) solicitation of Plaintiff's employees who had hands on knowledge of the Insight System who could perform support of Insight Systems; (iii) use of the knowledge of the Insight System provided by the solicited employees to use the Plaintiff's Insight System as a springboard to develop an enhanced version of the Insight System that would keep intact the basic accounting system of Insight but improve the ease of input of basic data by (among other things) taking existing functions of the Insight System and improving upon them (hereinafter referred to as the "McCracken Plan").

21.    In furtherance of the McCracken Plan, during a Christmas party in 2000, McCracken met with Griffith and Dunmire (who at the time still were employed by Plaintiff) and discussed the essence of the McCracken Plan. The discussion was intended to and did have the effect of encouraging Griffith and Dunmire to terminate their employment with Plaintiff and to go work for one or more of the McCracken Entities.

22.    In furtherance of the McCracken Plan, during February 2001, McCracken caused MIS to hire Stanton, Griffith and Dunmire as employees of MIS and to retain DiMarco as an outside consultant for MIS. On or about February 26, 2001, McCracken held a meeting with Stanton, Griffith and Dunmire during which he agreed to indemnify each for any liability associated with their separation from employment with the Plaintiff and their acceptance of employment with MIS. Such indemnification included, but was not limited to, damages arising from their separate breaches of their respective confidentiality agreements as set forth below.

23.    Also during that February 26, 2001 meeting, McCracken revealed that the essence of the McCracken Plan was to hold MIS out as being able to provide support services for the Insight System as a device to steal the Plaintiff's Insight System customer base under the pretense of developing a new and improved insurance agency management system.

6

### Joanne Stanton

24.     On or about December 15, 1992, Stanton began working for Plaintiff as a Customer Service Manager involved with (among other things) the support and servicing of the Insight System to existing and prospective Insight customers.

25.     As a condition of her employment with Plaintiff, on or about December 15, 1992, Stanton entered into a Confidential Employment Agreement with Plaintiff which required her (among other things) to protect and not disclose ebix's trade secrets and confidential and proprietary business information for the term of her employment and at all times thereafter.

26.     While an employee of Plaintiff, Stanton was the Manager of the Insight Support Group, which provided support services to Plaintiff's Insight customers.

27.     In furtherance of the McCracken Plan, McCracken solicited Stanton to be an employee of MIS, which Stanton accepted on or about February 22, 2001.  Stanton voluntarily terminated her employment with ebix on or about February 23, 2001.

28.     Upon leaving the employ of ebix, Stanton executed a document entitled "Employee Documentation Release Form," wherein she asserted that "all documentation, customer lists and any other proprietary information issued to me while at ebix.com, inc. have been returned to ebix and are no longer in my possession."

29.     On or about February 15, 2001, ebix sent Stanton a letter reminding her of her obligations under her Confidential Employment Agreement as well as her common and statutory law duties to refrain from compromising ebix's trade secrets and other intellectual property.

30.     After being solicited by McCracken but prior to leaving ebix, Stanton authorized issuance of an upgrade to the Insight System (the Beat 5 System) that was only in the development stage.  Stanton knew that the Beat 5 System had not been fully tested and was potentially defective, yet she authorized its release for the purpose of sending existing customers

7

of the Insight System a defective product in order to facilitate the ability of an Insight System competitor to solicit the Plaintiff's Insight System customers.

31.     After being solicited by McCracken but prior to leaving ebix, Stanton participated in a conference call with her supervisor, Lynn Buganan, to contact existing Insight System customers to advise them of the change over in responsibilities.  The customers were contacted using the Insight Customer Tracking System.

32.     Stanton is and at all relevant times was employed at MIS as a Customer Service Representative, and her primary responsibilities on behalf of MIS have been to provide support to former ebix clients on their use of the Insight System.

33.     Stanton also was hired by MIS to develop an Insurance Agency Management System that is designed to use the Insight System as a springboard by using and keeping intact the basic accounting system of Insight but improving the ease of input of basic data.

### Gayle Griffith

34.     On or about December 16, 1992, Griffith began working for Plaintiff as a Senior Customer Service Representative and Senior Software Analyst involved with (among other things) the marketing, sale and servicing of the Insight System to existing and prospective Insight customers.

35.     As a condition of her employment with Plaintiff, on or about December 16, 1992, Griffith entered into a Confidential Employment Agreement with Plaintiff which required her (among other things) to protect and not disclose ebix's trade secrets and confidential and proprietary business information for the term of her employment and at all times thereafter.

36.     In furtherance of the McCracken Plan, McCracken solicited Griffith to be an employee of MIS, which Griffith accepted on or about February 22, 2001.  Griffith voluntarily terminated her employment with ebix on or about February 23, 2001.

37.     Upon leaving the employ of ebix, Griffith executed a document entitled "Employee Documentation Release Form," wherein she asserted that "all documentation, customer lists and any other proprietary information issued to me while at ebix.com, inc. have been returned to ebix and are no longer in my possession."

38.     On or about February 15, 2001, ebix sent Stanton a letter reminding her of her obligations under her Confidential Employment Agreement as well as her common and statutory law duties to refrain from compromising ebix's trade secrets and other intellectual property.

39.     Griffith currently is employed at MIS as a Customer Service Representative, where her primary responsibilities on behalf of MIS have been to provide support to former ebix customers on their use of the Insight System.  More specifically, since March of 2001, Griffith has worked four (4) days a week troubleshooting the Insight System for former ebix Insight customers that are now customers of MIS.

40.     Griffith was hired by MIS purportedly for the purpose of developing new insurance products but since that date no such insurance products have been developed; she has had no involvement in any such insurance products; and she has no background in the technical skills of programming, processing methodology, design or system configuration necessary for the development of such new products.

### Paula Dunmire

41.     On or about February 24, 1993, Dunmire began working for Plaintiff as a Senior Customer Service Representative involved with (among other things) supporting and servicing the Insight System to existing and prospective Insight customers.

42.     As a condition of her employment with Plaintiff, on or about February 24, 1993, Dunmire entered into a Confidential Employment Agreement with Plaintiff which required her

(among other things) to protect and not disclose ebix's trade secrets and confidential and proprietary business information for the term of her employment and at all times thereafter.

43.     In furtherance of the McCracken Plan, McCracken solicited Dunmire to be an employee of MIS, which Dunmire accepted on or about February 22, 2001.  Dunmire voluntarily terminated her employment with ebix on or about February 23, 2001.

44.     Upon leaving the employ of ebix, Dunmire executed a document entitled "Employee Documentation Release Form," wherein she asserted that "all documentation, customer lists and any other proprietary information issued to me while at ebix.com, inc. have been returned to ebix and are no longer in my possession."

45.     On or about February 15, 2001, ebix sent Dunmire a letter reminding her of her obligations under her Confidential Employment Agreement as well as her common and statutory law duties to refrain from compromising ebix's trade secrets and other intellectual property.

46.     Dunmire currently is employed at MIS as a Customer Service Representative, where her primary responsibilities on behalf of MIS have been to provide support to former ebix customers on their use of the Insight System.  More particularly, since March of 2001, she has worked at least four (4) days a week troubleshooting the Insight System for former ebix customers that are now customers of MIS.

47.     Shortly after being hired, Dunmire participated in a conference call with Stanton in which they contacted various existing customers of ebix for the purpose of soliciting them as customers of MIS.

48.     Dunmire was hired by McCracken and MIS purportedly for the purpose of developing new insurance products, but since the commencement of her employment no such insurance products have been developed; she has had no involvement in any such insurance products; and she has no background in the technical skills of programming, processing

10

methodology, design or system configuration necessary for the development of such new products.

### Dominick DiMarco

49.     On or about February 16, 1993, DiMarco began working for Plaintiff as the Director of Technical Support involved with (among other things) the development, support and enhancement of the Insight System to existing and prospective Insight customers.

50.     As a condition of his employment with Plaintiff, on or about February 16, 1993, DiMarco entered into a Confidential Employment Agreement with Plaintiff which required him (among other things) to protect and not disclose ebix's trade secrets and confidential and proprietary business information for the term of his employment and at all times thereafter.

51.     Plaintiff terminated DiMarco's employment on or about June 30, 2000.  In furtherance of the McCracken Plan, McCracken solicited DiMarco to work as a Consultant for MIS.

52.     After leaving the employ of ebix, DiMarco executed a document entitled "Employee Documentation Release Form," wherein he asserted that "all documentation, customer lists and any other proprietary information issued to me while at ebix.com, inc. have been returned to ebix and are no longer in my possession."

53.     On or about February 22, 2001, ebix sent DiMarco a letter reminding him of his obligations under his Confidential Employment Agreement as well as his common and statutory law duties to refrain from compromising ebix's trade secrets and other intellectual property.

54.     DiMarco currently is an outside Computer Software Consultant for MIS and has been acting in that capacity since in or about April of 2001.  Since that date he has worked primarily in support of the Insight System being used by former ebix customers.

55.    In late 1999, while the McCracken Non-Competition Agreement was still in full force and effect, McCracken first informed DiMarco of McCracken's plan to develop an insurance computer system that competes directly with the Insight System.

### Defendants' Solicitation Of ebix Customers

56.    Commencing in or about June 2000, the Defendants, through MIS, began holding themselves out as being engaged, and in fact are engaged, in the development, advertising, promotion and sale of a computer software system that purports to service, support, enhance, improve, repair or replace the Insight System (the "Defendants' Substitute Insight System").

57.    Defendants have sought to market their Substitute Insight System by soliciting Plaintiff's customers and holding themselves out as purporting to service, support, upgrade and enhance ebix's proprietary and copyrighted Insight System.  More particularly, on June 11, 2001 MIS sent letters to "ebix.com, Inc. Customers" inviting them to a presentation regarding the Defendants' Substitute Insight System.

58.    Defendants have solicited Plaintiff's customers by, among other things, informing such customers of their new business relationship with, and address of, MIS; promising to deliver faster and more advanced service, support, upgrades and enhancements to the Insight System; and falsely informing Plaintiff's customers that MIS has the sole and exclusive capability to delivery and provide timely service, support, enhancements and upgrades to the Insight System.

59.    Each communication made by Defendants to Plaintiff's customers: (a) are false; (b) were false when made and when provided to such customers; (c) were known by Defendants to be false; (d) were made to induce the Plaintiff's customers to terminate their relationships with Plaintiff and to retain MIS to provide support services for the Insight System; and (e) were made

willfully, wantonly and maliciously to cause Plaintiff to suffer economic damage including, but not limited to, lost profits.

60.     Since January 1, 2001, no fewer than twenty-six (26) of Plaintiff's Insight System customers have terminated their support/service contracts with Plaintiff and have become customers of the McCracken Entities.  Prior to January 1, 2001, each of those former Insight customers of Plaintiff were serviced by DiMarco, Dunmire, Stanton and/or Griffith as employees of Plaintiff.

61.     Defendants' acts have caused Plaintiff to suffer and continue to suffer economic losses in an amount to be proved at trial (but not less than $163,643) and irreparable injury to Plaintiff's goodwill, reputation, profits and business opportunities.  Accordingly, in addition to damages for actual losses, Plaintiff is entitled to injunctive relief in accordance with principles of equity.

## COUNT I
### Breach of Contract against McCracken

62.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 61 of this Complaint.

63.     In the McCracken Confidentiality Agreement, McCracken agreed to (among other things): (i) not compete with Plaintiff directly or indirectly; (ii) not solicit any of Plaintiff's customers or businesses; and, (iii) not use for his own benefit any of Plaintiff's trade secrets, including but not limited to any information relating to the Insight System.

64.     Plaintiff fulfilled all of its obligations under the McCracken Confidentiality Agreement.

65.     McCracken breached his obligations under the McCracken Confidentiality Agreement by (among other things) (i) forming the McCracken Entities for the specific purpose of competing with and being a competitor of Plaintiff; (ii) soliciting DiMarco, Dunmire, Stanton,

and Griffith to become employees of one or more of the McCracken Entities; and (iii) directing

DiMarco, Dunmire, Stanton and Griffith to solicit the Plaintiff's Insight System customers and

violate their contractual obligations to Plaintiff.

66. By reason of McCracken's breaches of the McCracken Non-Competition

Agreement, Plaintiff has suffered damages which are continuous and ongoing.

## COUNT II
### Breach of Contract against DiMarco

67. Plaintiff repeats and realleges the allegations in paragraphs 1 through 66 of this

Complaint.

68. In the Confidential Employment Agreement signed by DiMarco, DiMarco agreed

to (among other things) not use for his own benefit any of Plaintiff's trade secrets, including but

not limited to any information relating to the Insight System and the Plaintiff's list of existing

and prospective customers.

69. Plaintiff fulfilled all of its obligations under the Confidential Employment

Agreement signed by DiMarco.

70. DiMarco breached his obligations under the Confidential Employment Agreement

by (among other things) using and/or disclosing trade secrets and other confidential and

proprietary business information of Plaintiff to support existing and prospective customers of

Plaintiff's Insight System.

71. By reason of DiMarco's breach of his Confidential Employment Agreement,

Plaintiff has suffered damages which are continuous and ongoing.

## COUNT III
### Breach of Contract against Dunmire

72. Plaintiff repeats and realleges the allegations in paragraphs 1 through 71 of this

Complaint.

14

73.   In the Confidential Employment Agreement signed by Dunmire, Dunmire agreed to (among other things) not use for her own benefit any of Plaintiff's trade secrets, including but not limited to any information relating to the Insight System and the Plaintiff's list of existing and prospective customers.

74.   Plaintiff fulfilled all of its obligations under the Confidential Employment Agreement signed by Dunmire.

75.   Dunmire breached her obligations under the Confidential Employment Agreement by (among other things) using and/or disclosing trade secrets and other confidential and proprietary business information of Plaintiff to support existing and prospective customers of Plaintiff's Insight System.

76.   By reason of Dunmire's breach of her Confidential Employment Agreement, Plaintiff has suffered damages which are continuous and ongoing.

## COUNT IV
### Breach of Contract against Stanton

77.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 76 of this Complaint.

78.   In the Confidential Employment Agreement signed by Stanton, Stanton agreed to (among other things) not use for her own benefit any of Plaintiff's trade secrets, including but not limited to any information relating to the Insight System and the Plaintiff's list of existing and prospective customers.

79.   Plaintiff fulfilled all of its obligations under the Confidential Employment Agreement signed by Stanton.

80.   Stanton breached her obligations under the Confidential Employment Agreement by (among other things) using and/or disclosing trade secrets and other confidential and

proprietary business information of Plaintiff to support existing and prospective customers of

Plaintiff's Insight System.

81.     By reason of Stanton's breach of her Confidential Employment Agreement,

Plaintiff has suffered damages which are continuous and ongoing.

## COUNT V
### Breach of Contract against Griffith

82.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 81 of this

Complaint.

83.     In the Confidential Employment Agreement signed by Griffith, Griffith agreed to

(among other things) not use for her own benefit any of Plaintiff's trade secrets, including but

not limited to any information relating to the Insight System and the Plaintiff's list of existing

and prospective customers.

84.     Plaintiff fulfilled all of its obligations under the Confidential Employment

Agreement signed by Griffith.

85.     Griffith breached her obligations under the Confidential Employment Agreement

by (among other things) using and/or disclosing trade secrets and other confidential and

proprietary business information of Plaintiff to support existing and prospective customers of

Plaintiff's Insight System.

86.     By reason of Griffith's breach of her Confidential Employment Agreement,

Plaintiff has suffered damages which are continuous and ongoing.

## COUNT VI
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### [As to all Defendants]

87.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 86 of this

Complaint.

88.     Implied in every Massachusetts contract is a covenant of good faith and fair dealing.

89.     The Defendants breached the covenant of good faith and fair dealing by, among other things, blatantly disregarding their contractually agreed-upon covenants not to compete and/or not to use or disclose trade secrets and other confidential and proprietary business information belonging to Plaintiff.

90.     As a result of Defendants' breach of the covenant of good faith and fair dealing, Plaintiff has suffered and will continue to suffer damages.

## COUNT VII
### Violation of the Illinois Trade Secrets Act
### [As to all Defendants]

91.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 90 of this Complaint.

92.     Each transaction, occurrence or contract as set forth in this Complaint is governed by the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA").

93.     All information pertaining to the Insight System, including all service, support, upgrades and enhancements, are trade secrets of the Plaintiff under the ITSA.

94.     The Plaintiff's list of its prior, current and prospective Insight System customers are trade secrets of the Plaintiff under the ITSA.

95.     The foregoing trade secrets of Plaintiff are of substantial economic value and not generally known to other persons who can obtain economic value from their disclosure. Plaintiff has taken reasonable efforts to maintain the secrecy or confidentiality of the indicated trade secrets, including (but not limited to) making such trade secrets the subject of a written confidentiality agreement with each Defendant.

96.    The Defendants have misappropriated the trade secrets of Plaintiff, obtained both during and after their employment with Plaintiff, willfully, wantonly and maliciously.

97.    By reason of Defendants' misappropriation of Plaintiff's trade secrets, Plaintiff has suffered damages which are continuous and ongoing.

### COUNT VIII
### Violation of the Massachusetts Trade Secrets Act
### [As to all Defendants]

98.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 97 of this Complaint.

99.    Each transaction, occurrence or contract as set forth in this Complaint is governed by the Massachusetts Trade Secrets Act, M.G.L.c. 93, § 42 ("MTSA").

100.    All information pertaining to the Insight System, including all service, support, upgrades and enhancements, are trade secrets of the Plaintiff under the MTSA.

101.    The Plaintiff's list of its prior, current and prospective Insight System customers are trade secrets of the Plaintiff under the MTSA.

102.    The foregoing trade secrets of Plaintiff are of substantial economic value and not generally known to other persons who can obtain economic value from their disclosure.  Plaintiff has taken reasonable efforts to maintain the secrecy or confidentiality of the indicated trade secrets, including (but not limited to) making such trade secrets the subject of a written confidentiality agreement with each Defendant.

103.    The Defendants have misappropriated the trade secrets of Plaintiff, obtained both during and after their employment with Plaintiff, willfully, wantonly and maliciously.

104.    By reason of Defendants' misappropriation of Plaintiff's trade secrets, Plaintiff has suffered damages which are continuous and ongoing.

## COUNT IX
### Tortious Interference with Contractual Relations
### [As to All Defendants]

105.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 104 of this Complaint.

106.   By engaging in the conduct described above, including soliciting existing ebix customers to cancel their support and maintenance contracts with ebix, Defendants have interfered with and induced the breach of the various support agreements between ebix and its customers.

107.   In addition, by soliciting Dunmire, Stanton, Griffith and DiMarco to terminate their employment with ebix and accept employment with one or more of the McCracken Entities to solicit and/or provide support on the Insight System to ebix customers, McCracken has interfered with and induced the breach of the their Confidential Employment Agreements with ebix.

108.   Defendants' conduct was willful, intentional, non-privileged, oppressive, fraudulent and malicious, and has caused and will continue to cause irreparable harm and monetary damage to Plaintiff.

## COUNT X
### Violation of M.G.L. c. 93A
### [As to All Defendants]

109.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 108 of this Complaint.

110.   Defendants are engaged in trade or commerce within the Commonwealth of Massachusetts within the meaning of M.G.L. c. 93A §§ 2 and 11.

111.    Defendants' conduct as described above, including without limitation its interference with Plaintiff's contracts with its customers, constitutes unfair methods of competition and unfair or deceptive acts or practices in violation of M.G.L. c. 93A §§ 2 and 11.

112.    Defendants unfair and deceptive trade practices complained of herein occurred primarily and substantially in Massachusetts.

113.    Defendants' conduct is willful, intentional, non-privileged, oppressive, fraudulent and malicious, and has caused and will continue to cause irreparable harm and monetary damage to Plaintiff, including lost profits, attorneys' fees, costs and interest.

**COUNT XI**
**Violation of the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq.***
**[As to All Defendants]**

114.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 113 of this Complaint.

115.    Plaintiff is the owner of an original computer software program named Insight. Plaintiff has been and is the owner of the copyright in the Insight Computer Program and all related documentation and manuals.

116.    Plaintiff filed for registration of the Insight Computer Program and corresponding manuals, which has been registered under Registration No. TXu-654-319, with an effective date of October 31, 1994 (the "Copyrights").

117.    Upon information and belief, Defendants have copied, or caused to be copied, all or part of the Insight Computer Program and/or related documentation and manuals for their own benefit without Plaintiff's authorization.

118.    Upon information and belief, Defendants have used all or part of the Insight Computer Program and/or related documentation and manuals for their own benefit without Plaintiff's authorization.

119   By reason of Defendants' infringement of Plaintiff's Copyrights, Plaintiff has been damaged reparably and irreparably.

120.   Unless enjoined, Defendants will continue to infringe Plaintiff's Copyrights and cause injury to Plaintiff.

121.   Upon information and belief, Defendants' infringement of Plaintiff's Copyrights was committed "willfully" as that term issued in 17 U.S.C. § 504(c)(2) in that, at all material times, Defendants knew or should have known of Plaintiff's Copyrights.

**Prayers for Relief**

WHEREFORE, ebix prays that this Court:

1.   Enter judgment in Plaintiff's favor on Counts I through XI of this Second Amended Complaint.

2.   Enter a preliminary and permanent injunction against Defendants and their agents, servants, employees, consultants, officers, directors, attorneys, affiliates, successors and assigns, and any other individual or entity within their control or supervision, and all other persons or entities acting in concert or on their behalf or participating with them:

(a)   enjoining Defendants from disclosing, using, converting, appropriating, retaining, selling, transferring or copying for themselves or on behalf of any other person or entity any confidential and proprietary business information and trade secrets of ebix;

(b)   directing Defendants to return to ebix, within three (3) business days of the Order of Court, any confidential and proprietary business information and trade secrets of ebix and other property of ebix in their possession, custody, or control, including but not limited to all originals and all copies of all books, manuals, records, files, software and any other information or property of ebix in their possession, custody or control, and any information or property created or derived therefrom;

(c)   enjoining and prohibiting Defendants from soliciting, offering employment to and hiring employees and former employees of ebix who are known to be subject to Noncompete and/or Confidentiality Agreements or other similar agreements with ebix;

21

(d)   enjoining and prohibiting Defendants from, directly or indirectly, continuing, maintaining or renewing any contact with the Plaintiff's customers as alleged herein;

(e)   directing Defendants to cease and desist all advertisements or communications relating to its Substitute Insight System and all solicitations of or communications with Plaintiff's customers or clients;

(f)   directing Defendants to issue corrective announcements that the Defendants' Substitute Insight System is not related to or compatible with or an enhancement of the Plaintiff's Insight System;

(g)   pursuant to 17 U.S.C. § 502, enjoining the Defendants from further infringement of the Copyrights;

(h)   directing Defendants to file with this Court and serve upon Plaintiff within ten (10) business days of the Order of Court affidavits setting forth the manner in which they have complied and will continue to comply with the Order of the Court; and

(i)   granting ebix such other and further injunctive relief as is proper and just.

3.   Award ebix compensatory damages, including, but not limited to, lost income and profits suffered by ebix on account of the actions described herein and any amounts expended by ebix, including but not limited to the cost of its employees' time recreating any confidential information already misappropriated by Defendants.

4.   Award ebix the greater of: (a) the actual damages caused by the Defendants' copyright infringements and all profits derived by the Defendants from their infringement pursuant to 17 U.S.C. § 504(b); (b) statutory damages in the amount of thirty thousand dollars ($30,000) per work pursuant to 17 U.S.C. § 504(c)(1); and (c) statutory damages in the amount of one hundred and fifty thousand dollars ($150,000) per work for Defendants' willful infringement pursuant to 17 U.S.C. § 504(c)(2).

5.   Immediately impound all allegedly infringing servers, computer programs, and all disks, digital copies, plates, molds, matrices, masters, tapes, film negatives, and other articles and

means of making or using products which infringe the Copyrights, pursuant to 17 U.S.C. §

503(a).

6.      Order destruction of all infringing servers, computer programs, and all disks,

digital copies, plates, molds, matrices, masters, tapes, film negatives, and other articles and

means of making or using products which infringe the Copyrights, pursuant to 17 U.S.C.

§ 503(b).

7.      Award double or treble damages in accordance with the terms of M.G.L. c. 93A.

8.      Award ebix its reasonable attorneys' fees and costs of this action, including

(without limitation) attorneys' fees, costs and expenses pursuant to 17 U.S.C. § 505.

9.      Order such other relief as is proper and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues triable of right by jury.

ebix.com, INC.

By its attorneys,

Kenneth M. Bello, BBO# 036630
Steven D. Weatherhead, BBO # 637601
Mintz, Levin, Cohn, Ferris,
    Glovsky and Popeo, P.C.
One Financial Center
Boston, MA  02111
(617) 542-6000

Dated:  May 24, 2002

LIT 1334710v2

I hereby certify that a true copy of the
above document was served upon the
attorney of record for each party by
mail/hand on _5/24/02_